**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **DON WORLEY & COMPANY, LLC,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 1: 04-cv-1187** |
| **THE UNITED STATES OF AMERICA** | ) | |
| **Defendant** | ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Comes now the Plaintiff Don Worley & Company, LLC (hereinafter "Worley"), and submits this Memorandum in support of its Motion for Partial Summary Judgment.

## A. INTRODUCTION AND FACTUAL BACKGROUND

As alleged in the Complaint, the Plaintiff Worley is an Alabama Limited Liability Company, with its principal place of business in Andalusia, Alabama, which provides general contracting services. In September of 2002, Worley and United States Army Corps of Engineers (the "Corps") entered into Contract number DACW 66-02C-0023, for Worley to furnish labor, equipment, materials and services in connection with the excavation of the Blue Lake Outlet ditches in Crittenden County, Arkansas. (Complaint, ¶4). Worley fully performed all of its obligations under the Contract, but the Corps failed and refused to pay all funds owed Worley for work performed on the Project. (Complaint, ¶6). A portion of the funds owed Worley is an amount of at least $303,451.95 for original excavation dirt quantities billed under line item number 0004 of the Contract, entitled "Excavation," which the Corps has refused to pay on the basis that it believes Worley did not actually excavate quantities of dirt sufficient to earn funds in that amount. In contrast, Worley contends that the plain language of the Contract requires that it

be paid for original dirt excavation based on a theoretical computation, not on actual quantities, and that after calculating the theoretical quantity of dirt, the sum of at least $303,451.95 is owed. The Corps has required three separate employees to perform both actual and theoretical calculations for the dirt excavation quantities, but has to date not offered to pay any figure to Worley under the excavation line item, either the theoretical quantity or even the actual quantity. (Deposition of Donald Tudor, pp. 173-4, 210).

## B. ARGUMENT AND AUTHORITIES

1. Introduction

Significant changes to summary judgment practice have occurred over the past two decades due to three 1986 Supreme Court opinions: Anderson v. Liberty Lobby, Inc., 447 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); and Matsushita Electric Industrial Co., Ltd, v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The first of the recent Supreme Court decisions which dramatically changed summary judgment law was Anderson v. Liberty Lobby, Inc., 447 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Liberty Lobby was a libel action against the columnist Jack Anderson and others working with him. 106 S.Ct at 1508. The defendants had referred to the plaintiff organization and some of its leaders as "Neo-Nazis," anti Semites, racists, and fascists. Id. According to the then-existing First Amendment libel doctrine, plaintiffs, as public figures, could not recover unless they could prove by clear and convincing evidence that Anderson had published calculated falsehoods or had written his article with reckless disregard for the truth. Id. New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). After

discovery, the defendants moved for summary judgment on the ground the plaintiffs could not demonstrate that this burden could be met. Liberty Lobby, 106 S.Ct. at 2508.

In support of the motion for summary judgment, the defendants filed an extensive affidavit by one of their author-investigators detailing his sources. Id. at 2508-09. In response, the plaintiffs filed several affidavits asserting that the sources were unreliable and that the publication was untrue and insufficiently supported by an adequate investigation. Id. at 2509. The trial court had granted the summary judgment, but the Court of Appeals for the District of Columbia had reversed the trial court's granting of the summary of judgment motion. Id.

The Supreme Court reversed the Court of Appeals and held that the trial court had properly granted summary judgment. Id. at 2515. It ruled that not every issue of fact or conflicting inference presents a genuine issue of material fact requiring the denial of a summary judgment motion. Further, the Court held that the materiality of any fact should be determined by the substantive law of the case. Id. at 2510. The Court went even further and held that the test for deciding a motion for summary judgment is the same as that for a directed verdict motion. Id. at 2512. There is no issue for trial, the Court stated, unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. Thus, the Court concluded, "The mere existence of a scintilla of evidence in support of the Plaintiff's position will be in sufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id.

Anderson v. Liberty Lobby, Inc., 447 U.S. 242 (1986), thus requires the trial court to view the proof by affidavit and deposition in the light of the evidentiary standard in which the jury will eventually view it. "in essence … the inquiry under [summary judgment] is … whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law." Id. at 251-251. As to the burden to present such evidence, the Court held that: "the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." Id.

One must also consider the case of Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), decided on the same day as Liberty Lobby, to fully appreciate the sea change in summary judgment law caused by these decisions. Celotex was an asbestos products liability wrongful death action. 106 S.Ct. at 2551. After some discovery, the defendant moved for summary judgment, pointing out to the trial court that the plaintiff had been unable to produce any evidence that the decedent had ever been exposed to the defendant's asbestos products. 106 S.Ct. at 2551. The plaintiff countered that summary judgment should not be granted on the record absent the defendant's showing by at least some of the materials mentioned in Rule 56(e) that the decedent had not been so exposed. Id. The trial court granted summary judgment, but was reversed by the Court of Appeals for the District of Columbia. Id. The Supreme Court again reversed, holding that summary judgment was appropriate under the circumstances. Id. at 2555.

The Court held the movant had made a sufficient showing of a lack of a genuine issue of material fact on the crucial issue under consideration by demonstrating that the plaintiff, after an adequate opportunity for discovery, was unable to meet her burden of proof. Id. at 2553. The Court rejected the argument, accepted by the Court of Appeals, that the movant's initial showing of lack of a genuine issue of material fact was insufficient because it was not supported by affidavits or other factual materials described in Federal Rule of Civil Procedure 56. Id.

In other words, the movant could challenge the opposing party to "put up or shut up" on a critical issue. After an opportunity for discovery, if the respondent did not "put up," summary judgment was proper. The Court concluded thusly: "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred" Id. at 2554.

The third case altering prior summary judgment law was Matsushita Electric Industrial Co., Ltd, v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), on remand, 807 F.2d 44 (3d Cir. 1986), which, in harmony with Liberty Lobby and Celotex, indicated a more favorable disposition for granting summary judgment motions. In Matsushita, the Court held that summary judgment was appropriate even in a complex antitrust case. 106 S.Ct at 1361-62. It stated: "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. at 1356.

Current court decisions and commentary concerning the effect of the above three Supreme Court decisions yield the conclusions that they established certain principles for a "new era" of summary judgment practice, some of which are as follows:

1. The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.
2. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.
3. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."
4. As on federal directed verdict motions, the "scintilla rule" applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

> 5. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

Street v. J. C. Bradford & Co., 886 F2d 1472, 1479-80 (6th Cir. 1989).

For all five of these reasons, this Motion for Partial Summary Judgment must be granted.

2. The Language of the Contract between the Parties Requires that Worley be Paid for Dirt Excavation Based On a Theoretical Calculation Rather than Actual Quantities.

The Contract executed by the parties, and marked as Exhibit 3 to the Deposition of Louis Davidson, a Corps employee, contains within it section 01025, entitled "Measurement and Payment." Part 1.1 of that section covers lump sum payment items, and part 1.2 covers unit price payment items. Part 1.2.1 (1) lists as the very first unit price item: "Excavation." Sub-subpart a., "Measurement," provides in material part:

> A survey of the site for excavation of outlet ditches A and B will be made in accordance with the SPECIAL CONTRACT REQUIREMENTS entitled "Quantity Surveys-Alternate I" and all measurement of excavation will be based on this survey. The quantity of ditch excavation to be paid for will be computed between the ground surface, as determined by the above noted surveys, and the theoretical slope lines and grade lines for such excavations as indicated on the drawings and/or specified herein.

Sub-subpart b., "Payment," further provides that payment for excavation "measures (sic) as prescribed hereinabove, will be made at the applicable Contract unit price per cubic yard for "Excavation,…" .

Wendell Norman, the Corps contracting officer responsible for the project at issue, recognized in his Deposition that the above contract parts controlled the obligation of the Corps to pay for the excavation work of Worley. (Norman Depo, pp. 74-5, 80, 105, 107.)

Of course, it is axiomatic that when construing Contract language, the words should be given their natural, ordinary meaning. The sentence above highlighted in the contract at issue clearly provides that Worley is to be paid for excavation based on a computation of the dirt volume between the original ground surface (prior to the start of work), as shown on the original

survey, and the theoretical slope lines and grade lines, which show on the drawings how the ditch is to look after the completion of the work. The language can be given no other reasonable construction. For this reason, the Motion must be granted.

3. The Contracting Officer Responsible for the Interpretation and Application of the Contract at Issue Admitted in His Deposition that Worley was Entitled to be Paid Under the Line Item in the Contract for Dirt Excavation Based on a Theoretical Calculation.

Despite the demands of Worley, the Corps has never offered to pay the theoretically calculated dirt excavation quantities, and it has never even offered to pay Worley the actual quantity as calculated by three separate Corps employees (Tudor Depo, pp. 173-4, 210). Notwithstanding this fact, when pressed at his deposition, the contracting officer could not escape the clear language of the Contract of which he was responsible for administering, and had to admit that the Corps was required to pay Worley based on the theoretical computation rather than the actual quantities:

Q. Well, based on the letter, you certainly would agree with me, would you not, that if your computations, -- if the contractor could show there is error in the computations that resulted in The Corps saying there is 252,975 cubic yards between the original survey and the theoretical line, then the contractor would be entitled to be paid whatever the correct computation showed that difference to be?

A. Correct, if he submitted something and that was reviewed and approved, yes, sir.

Q. All right. So, it doesn't matter whether he excavated out in the field, whether it's more or less, if he can convince The Corps that his calculation of the difference between the original survey and the theoretical lines is different than 252,975, he's going to be paid that number, true?

A. I would agree with that statement.

In addition to the plain ordinary meaning of the language in the Contract governing payment for excavation quantities, as admitted to by the contracting officer in his deposition testimony, he had also previously written a letter to Worley taking the very same position. Marked as Exhibit 28 during the Norman Deposition was a draft letter of the Corps addressed to Worley. In the letter where the contracting officer addresses the claim set forth by the

contractor, the above quoted language from section 10125, paragraph 1.2.1(1)(a) is discussed and the contracting officer based upon it opines that, "[i]t is noted therefore that even before excavation begins, a contractor should be able to determine the amount of paid excavation by taking his "before construction survey" data and applying the ditch design data noted on the drawings (i.e. location, slopes, bottom width, elevations etc.)." (Norman Depo pp. 142-3 Exhibit 28).

The contract language at issue is clear, and was admitted by the contracting officer in the letter written during the project as requiring Worley to be paid for dirt excavation on a theoretical computation. In addition, he admitted in his sworn deposition in this case that regardless of the quantity of dirt actually excavated in the field, Worley would either be entitled to be paid the Corps' theoretically calculated quantity, or Worley's own theoretically calculated amount, if he could prove it was the correct quantity number. For this further reason, the Motion must be granted. In fact, given the clarity of that deposition testimony, the inescapable conclusion explaining why the Corps still maintains the position that Worley can only be paid on actual quantities, is that the Corps continues to act in bad faith to withhold sums it knows is owed Worley for dirt excavation quantities, under the pretense of a contract disagreement that does not exist, simply to force Worley into submission and acceptance of the Corps' position on other disputed contract items.

4. The Corps in Calculating its Original Estimate for the Contract and in Paying Interim Pay Applications to Worley, Acknowledged by its Conduct that Worley Was to be Paid Based on a Theoretical Calculation Rather than Actual Quantities.

Mr. Norman also testified that Donald Tudor, another Corps employee, was the assistant contracting officer and was heavily relied upon by Mr. Norman. (Id. at 124.) Mr. Tudor in his deposition testified that the interim pay applications submitted by Worley and paid by the Corps did contain excavation quantities, and that the quantities billed and paid were arrived at by a

calculation performed in part in accordance with the above quoted contract language. That being, the Corps intended and knew that as the Project was progressing, and the excavation was being performed, it was not paying actual excavation out in the field, but was instead paying a project progress percentage multiplied by 243,018 cubic yards, which was the government's original theoretical estimate of the excavation to be performed on the Project. (Tudor Deposition, p. 102.)

Mr. Tudor had previously confirmed that the 243,018 figure, which was calculated by the Corps and inserted into the Contract at issue prior to its execution, was calculated precisely as the controlling contract language required, by taking the quantity difference between the original ground survey and the as-designed theoretical contours on the drawings. (Id. at 73-4). Obviously, the Corps understood the clear, ordinary, natural meaning of the words in the Contract it drafted, since it acted precisely in accordance with that language in putting together the original Contract excavation estimate and since it made payments to Worley during the progress of the job based on those theoretical quantities. For the Corps to now take the position that final payment for excavation should be made in any other way, calculated in any other manner, when the language of the Contract language does not draw any distinction between the original estimate, the interim payments and the final payment, is simply not a credible position. The Motion must be granted.

5. The Corps Previously Negotiated a Stipulation that Acknowledged the Correctness of Worley's Position on the Contract Language at Issue.

Attached as Exhibit "B" to the Affidavit of Don Worley, filed herewith, is a Stipulation negotiated between counsel for the Corps and counsel for Worley with the express intent of avoiding of the filing of this Motion. However, upon agreement by counsel on the language of the Stipulation, and after the drafting and inclusion by the Corps of the graphic diagram

contained therein, the Corps inexplicably reneged on its agreement and failed to have the Stipulation filed with the Court. Certainly, the negotiation of the Stipulation, and the intentional inclusion of the diagram therein drafted by the Corps, is a further acknowledgment of its understanding that the salient Contract language requires Worley to be paid an amount for all excavation resulting from the calculation between the original survey and the theoretical contours on the drawings. The blatant failure of the Corps to follow through with its agreement is, when added to the conduct discussed above, irrefutable evidence of the Corps' bad faith and its attempt to use the amounts clearly owed Worley under the excavation line item of the Contract as leverage to get Worley to accept less than what it is owed under other provisions of the Contract which are not the subject of this Motion.

## C. CONCLUSION

The Corps clearly understood the meaning of the contract language it drafted. It used that language as the basis for its original excavation estimate in the contract and used the resulting theoretically calculated dirt excavation quantity for the basis of all interim payments made to Worley. In addition, the contracting officer admitted in his deposition that if Worley could convince the Corps that his calculation of the theoretical quantity was correct, he was entitled to be paid that theoretical number. For all these reasons, the Motion for Partial Summary Judgment must be granted and Partial Summary Judgment should be entered recognizing the requirement of the Contract that Worley be paid under line item number 0004, "Excavation," in the Contract, for the dirt excavation quantity in an amount calculated by comparing the original survey contours with the theoretical contours on the project drawings.

Respectfully,

/S/

Ted M. Hayden TN BPR No. 10471
The Hayden Law Firm, PLLC
2198 Judicial Drive
Germantown, Tennessee 38138
(901) 737-6480 phone
(901) 737-6481 facsimile
Attorneys for Don Worley &
Company, LLC

**CERTIFICATE OF SERVICE**

I hereby certify that on April 2, 2008, a copy of the foregoing document was filed electronically and transmitted to:

Roger A. Hipp
Commercial Litigation Branch, Civil Division
U.S. Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

/S/

Ted M. Hayden